IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** Plaintiff, v. **JESSE P. BLANKENSHIP,** Defendant. | **Case No: 17-3022-01-CR-S-MDH** |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through Timothy A. Garrison, United States Attorney for the Western District of Missouri, and Josephine L. Stockard, Assistant United States Attorney, respectfully submits this sentencing memorandum in the above-captioned matter, set for a sentencing hearing on October 30, 2018. For the reasons set forth below, the Government recommends that this Court sentence the defendant to 180 months on Count Three and 60 months on Count Four, for a total term of incarceration of 240 months. The sentence of 240 months is a joint recommendation by the parties as outlined in the plea agreement.

### I. BACKGROUND

On May 25, 2018, the defendant appeared before United States Magistrate Judge David P. Rush, and pleaded guilty to Counts Three and Four of a four-count Superseding Indictment. On June 25, 2018, the Court accepted the plea of guilty. On September 24, 2018, the final Presentence Investigation Report (PSR, Doc. 63) was filed.

### II. LEGAL STANDARD

Although the Sentencing Guidelines are no longer mandatory, *United States v. Booker*, 543 U.S. 220 (2005), sentencing still begins with a properly calculated, advisory Sentencing Guidelines

range. *See Gall v. United States*, 128 S. Ct. 586, 596 (2007); *Rita v. United States*, 127 S. Ct. 2456, 2464-65 (2007); *Booker*, 543 U.S. at 245-46; *United States v. Plaza*, 471 F.3d 928, 930 (8th Cir. 2006). Next, the Court must decide if a traditional departure under the Guidelines is appropriate, thus creating an advisory Guidelines sentencing range. *Plaza*, 471 F.3d at 930. After calculating the advisory Guidelines range, the Court considers that range, along with all the factors listed in 18 U.S.C. § 3553(a), in arriving at the final sentence. *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007); *Plaza*, 471 F.3d at 930.

### III. DISCUSSION

#### A. Statutory and Guidelines Calculations

*1. Guidelines and PSR Calculations*

The PSR finds a maximum term of imprisonment of 20 years as to Count Three and a minimum of five years imprisonment and a maximum of life imprisonment on Count Four, which must be imposed consecutive to Count Three. The Government concurs with these calculations.

As noted in paragraph 84 of the PSR, the plea agreement states that the range of punishment for Count Three is not more than 30 years imprisonment, not less than six years' supervised release, a $2,000,000 fine and a $100 mandatory special assessment. The PSR points out in paragraph one that the Government filed a notice of defendant's prior felony convictions, but also notes in paragraph 84 that an information under 21 U.S.C. § 851, was not filed. The notice noted in paragraph one was notice of the defendant's convictions for the purposes of impeachment at trial. To alleviate confusion, the information under Section 851 was not filed, so the range of punishment is as reflected in the PSR, and not in the plea agreement.

The PSR also finds a Guidelines range of 140 to 175 months as to Count Three and a consecutive 60 months for Count Four, for a combined range of 200 to 235 months imprisonment.

(PSR 20, ¶ 82.)  The PSR also finds a Guidelines supervised release range of three years as to Count Three and two to five years as to Count Four.  The Government concurs with those Guidelines calculations.

*2.    Defendant's Objections*

Pages 4-5, Paragraphs 5-7 – Facts in PSR

The defendant has objected to the facts contained in the PSR in paragraphs five through seven.  The Government will present these facts and additional facts at the sentencing hearing and would ask the Court to consider them in the facts and circumstances of the offense and the history and characteristics of the defendant.

Page 6, Paragraph 13 – Base Offense Level Calculation

The defendant has also objected to the PSR writer using the currency that was seized from the defendant in the calculation of the base offense level.  The defendant has admitted that he possessed the methamphetamine he had for sale.  The Government will present testimony about the cost of methamphetamine, which can vary, but the estimate by the PSR writer is a fair assessment and to attribute a large amount of currency found with a drug dealer as the proceeds of drug sales is a fair inference.  "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1 cmt. n. 5. "Moreover, the court can determine drug quantity using imprecise evidence, so long as the record reflects a basis for the court's decision." *United States v. Garcia*, 774 F.3d 472, 474 (8th Cir. 2014) citing *United States v. Zimmer,* 299 F.3d 710, 720 (8th Cir. 2002) (internal quotation omitted).
3

**B.   Statutory Sentencing Factors**

This Court must "impose a sentence sufficient, but not greater than necessary" to address the factors enumerated in 18 U.S.C. § 3553, including the Guidelines issued by the U.S. Sentencing Commission. These factors include:

1.   *Nature and Circumstances of the Offense*

There are three incidents outlined in the PSR.  The first was a warrant executed on August 23, 2016. (PSR 4, ¶ 5.)  Notably, paperwork from the Department of Corrections with the defendant's name on it was located in a bedroom.  (PSR 4-5, ¶ 5.)  In that same bedroom, agents located a rifle in a bag on the floor.  Throughout the house, there was evidence of drug distribution including methamphetamine, cocaine, baggies, scales, vacuum-seal bags, a vacuum seal machine, and several other firearms.  (PSR 5, ¶ 5.)  Outside the home was a red Chevy truck with white writing on the back.

On August 27, 2016, L.B. made several 911 calls reporting that a strange truck was at her home and that she was afraid it belonged to the defendant, her ex-boyfriend. (PSR 5, ¶ 6.) Notably, the red Chevy truck parked outside of L.B's home was the same truck that was parked outside the home where the warrant was executed on August 23, 2016.  In the final 911 call from L.B., L.B. reported that the defendant had shot D.O.  The pertinent part of the call was as follows:

| | |
|---|---|
| Background: | Unintelligible |
| 911: | 911, where is your emergency? |
| K.B.: | Ok, there's been a shooting on Osage Street (crying) Strafford, Missouri. |
| 911: | What address? |
| K.B.: | 110 East Osage. |
| 911: | Ok. Who has been shot? |
| K.B: | [D]. I helped…please, please…send an ambulance please.  It's ok (unintelligible). It's ok. |
| 911: | Ma'am.  I need you, I need you to answer my question.  Who has been shot? |
| K.B: | His name is [D]. I don't even know your last name. [O]. (Background noise) Oh my god.  Oh my god…. (Background). It's ok [D], it's ok. |
| 911: | Who shot him, ma'am? |

4

| | |
|---|---|
| K.B.: | Jesse Blankenship. There was (unintelligible, crying). |
| 911: | Where is he right now? Where is he right now? |
| K.B.: | Oh my god. I'm sorry. He took off in a vehicle. I don't fucking know… |
| 911: | What color, what color, kind of vehicle? |
| K.B.: | A white car. I…. |
| 911: | A white car? And what was his name? |
| K.B.: | Jesse Blankenship. He left his bike here and his truck is here at my house. It's my oldest son's dad. |
| 911: | Does he live there? (Overlap and Pause) Does he live there? |
| K.B.: | [D]? Or? No! No! Neither one of them do. [D] (unintelligible) was just…. |
| 911: | Ma'am, I've got help on its way. Ok. |
| K.B.: | Ok (crying) |
| 911: | Alright. I need you to listen to me. Is [D] with you right now? |
| K.B.: | Huh? Yes, he is. |
| 911: | Is [D] conscious? |
| K.B.: | Huh? |
| 911: | Is [D.] conscious? |
| K.B.: | Yes, he's conscious. |
| 911: | Ok. What part of his body was he shot in? |
| K.B.: | His arm. K.B. Aside: Yes, they're coming. |
| 911: | He's shot in the arm? |
| K.B.: | Yeah. Oh, here. I'm going to give the phone to my neighbor. |

The Strafford Police Department responded to the shooting and found D.O. with a gunshot wound to his arm. (PSR 5, ¶ 6.) The defendant fled after the shooting and was not located. (PSR 5, ¶ 7.) But the bullet casing found at the scene was recovered. (PSR 5, ¶ 6.) L.B. said that the defendant, who she was familiar with from a past relationship, had threated to kill her, at which point D.O. asked him to leave. (PSR 5, ¶ 6.)

A warrant was issued for the defendant's arrest and on August 29, 2016, deputies with the Greene County, Missouri, Sheriff's Office received information that the defendant was at a gas station in southwest Springfield. (PSR 5, ¶ 8.) Deputies attempted to stop the defendant, but instead of stopping, he led them on a 27-mile high speed chase through western Springfield and into rural Greene County. (PSR 5, ¶ 8.)

The defendant finally failed to negotiate a turn and crashed into a fence. (PSR 6, ¶ 8.) In his vehicle, two firearms—a Smith and Wesson and a Ruger—were located, approximately 4.65

5

grams of a mixture or substance containing methamphetamine, and a large bundle of cash totaling $7,800 that was wrapped in plastic. (PSR 6, ¶ 8.)

The Bureau of Alcohol, Tobacco, Firearms, and Explosives conducted an analysis comparison of the bullet casing from the scene of the August 27, 2016, shooting and the Smith and Wesson firearm recovered from the defendant's vehicle after the chase. (PSR 6, ¶ 10.) The analysis determined that the casing was consistent with having been fired from that firearm.

In a recent interview, nearly two years after the shooting, D.O. expressed that he was not certain if it was the defendant who shot him or another man who was with the defendant. However, whether the defendant was the shooter or not, it is clear that the defendant was there to engage K.B., threatened to kill her, someone who attempted to defend her got shot, the defendant left the scene, then two days later, the defendant had the firearm used in the shooting, drugs, and a large amount of cash.

What to make of this is that the defendant is a dangerous person who frightened his ex-girlfriend, and, at the very least, condoned the shooting of someone who tried to help her, and is a drug dealer, who does not hesitate to combine drugs and firearms, a lethal combination for anyone, but even more so for this defendant.

2.  *History and Characteristics of the Defendant*

In 2003, the defendant was arrested in fairly similar circumstances to those he found himself in on the evening of August 29, 2016. In 2003, the Webster County, Missouri, Sheriff's Office (WCSO) set up a road black to intercept him. (PSR 11, ¶ 34.) In his car, he had a sawed off shotgun and some of the components of a methamphetamine lab. (PSR 11, ¶ 34.) In an interview after his arrest with WCSO Detective Rick Hamilton, the defendant said he knew the firearm was there, knew it was illegal, and knew he was not supposed to have it. The defendant

6

said he did not have the firearm to use on police officers, but carried the firearm to use against other people who might "mess with him." The defendant also stated that he was in the business of manufacturing methamphetamine and manufactured about two to three ounces a day. The defendant said he was a good methamphetamine cook and other cooks were jealous of him. This arrest led to his federal conviction for being a felon in possession of a firearm in December of 2003 and a nearly three-year term in federal prison.

Even prior to that arrest in 2003, the defendant had convictions for property damage (PSR 8, ¶ 30) and stealing (PSR 9, ¶ 31). He had also been previously arrested for manufacturing a controlled substance and endangering the welfare of a child by grabbing and striking her in a moving vehicle (PSR 10, ¶ 33), which he was convicted for after his federal sentence was imposed.

He was released from federal prison on September 5, 2008. (PSR 11, ¶ 34.) Seven months later, his supervised release was revoked for 24 months with no term of supervised release to follow. (PSR 11, ¶ 34.) While on supervised release, he committed the crime of resisting arrest (PSR 11, ¶ 35) and refusing an officer's orders (PSR 12, ¶ 36.)

He was then released from federal prison again on March 15, 2011. (PSR 11, ¶ 34.) In May 2011, he was arrested for stealing (PSR 13, ¶ 38) and forging a check (PSR 12, ¶ 37); in June 2011 he was arrested for forging a signature at a Wal-Mart (PSR 13, ¶ 40). In August 2011, he was arrested after he fled from police, ran several stop signs, and passed by an elementary school while children were present (PSR 14, ¶ 41); forged checks in July (PSR 14, ¶ 42); and falsely impersonated someone else to create a liability, possessed a controlled substance, and was drunk in public (PSR 15, ¶ 43).

In August 2012, he went to state prison as a result of the August 2011 flight and July 2011 forgery. (PSR 14, ¶¶ 41 and 42.) He was paroled in September 2015. (PSR 14, ¶¶ 41 and 42.)

He was declared an absconder in May 2016. (PSR 14, ¶ 42.) The incidents in this case occurred in August of 2016, and he was returned to state prison in November of 2016, from where he was transported to federal court to appear on this case.

The defendant has 27 criminal history points, which is twice as many points as are required to qualify as the top level of offender. He has demonstrated that all he does with freedom is commit more crimes. While the defendant was in state prison between 2012 and 2015, the world of methamphetamine changed from local and lab-driven to import-driven, but the defendant apparently did not have trouble adapting. He has shown that he has no regard for the safety of the public or law enforcement, the property rights of others, or the plight of the addicts he has made by cooking and selling methamphetamine through the years.

The defendant has more than earned a 20 year prison sentence through his actions in this case, which demonstrate simply more of what his history shows and an escalation of violence and evasion.

3. *Need to Promote Respect for the Law*

His repeated endangerment of law enforcement and others by fleeing from police, along with his many criminal convictions, demonstrate a deep disrespect for the law. The defendant has never demonstrated that he thinks the law applies to him, but has always lived as if he was outside of it, at least until his next stay in prison. In a letter from the defendant to a friend, the defendant wrote: "Well I'm still a Gangster," and about his August 29, 2016, flight from police, he wrote: "I totaled a brand new benz! Talk about a bad day."

4. *Need to Afford Adequate Deterrence to Criminal Conduct*

Unlike many defendants who come before this court, this defendant has been to federal prison before. However, his first sentence was 37 months and then 24 months more months when

his supervised release was revoked. In state prison, he spent about four years. Those should have been deprivations of freedom sufficient to convince anyone who wanted to change that change was necessary.

Instead, imprisonment seems to have emboldened the defendant. While in prison, he joined the Aryan Circle (PSR 18, ¶ 67) and had multiple violations in prison related to his association with that group. With whatever added prestige or safety that offers the defendant in prison, it is difficult to determine whether the prison sentence imposed here will deter the defendant. But at 34, a 20-year sentence, imposed consecutive to his state prison sentence, will put his release age at his mid-50s, a time when he will have a great deal of life left to live, but a time when the public can only hope that the criminal ties he has made no longer exist and the life he has lived is one he can no longer sustain.

5.  *Need to Protect the Public from Further Crimes of the Defendant*

If deterrence is not possible, protecting the public is. A 20-year sentence grants the people of this community a reprieve from this defendant. When viewed in light of the danger and havoc he has caused over his 17-year criminal history, the only reprieve has been his past incarcerations. Again, incarceration will take over to protect those who drive the roads with the defendant, who live near him, who might engage in a relationship with him, and who might seek to buy drugs from him. The agreed-to sentence is wholly appropriate for this reason alone, but even more so when viewed in the context of all of the 3553 factors.

6.  *Need to Provide the Defendant with Education, Vocational Training, or Other Correctional Treatment*

The defendant has a GED and received prior training relating to mechanics. (PSR 19, ¶ 73.) He has expressed a desire to learn a trade while he is in prison. The defendant has said he does not feel he needs formal substance abuse treatment (PSR 19, ¶ 72), and the Government

9

would suggest that he be taken at his word and a valuable spot in the RDAP program not be given to this defendant. The Government would support his inclusion in the UNICOR program so that he can improve his job skills and attempt a different life upon release.

## IV. CONCLUSION

Title 18, United States Code, Section 3553 requires this Court to impose a sentence that considers the factors above, including the advisory Guidelines range. The Government respectfully requests that the facts and circumstances of the case, the defendant's behavior and history, the need to promote respect for the law, the need to deter the defendant from criminal behavior and protect the public from the defendant, and any other statutory sentencing factors be considered in reaching an appropriate sentence.

The Government respectfully requests that this Court impose a sentence of 240 months' imprisonment.

Respectfully submitted,

TIMOTHY A. GARRISON
United States Attorney

by    */s/ Josephine L. Stockard*

JOSEPHINE L. STOCKARD, Mo. Bar #63956
Assistant United States Attorney
Western District of Missouri
901 St. Louis Street, Suite 500
Springfield, Missouri 65806
(417)831-4406

### CERTIFICATE OF SERVICE

I hereby certify that on this the 24th day of October, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent e-mail notification of such filing to all CM/ECF participants in this case.

*/s/ Josephine L. Stockard*
JOSEPHINE L. STOCKARD

10

Case 6:17-cr-03022-MDH   Document 66   Filed 10/24/18   Page 10 of 10